O’NIELL, J.
The defendant was indicted and tried for the crime of manslaughter, and was convicted and sentenced to imprisonment in the penitentiary for seven years. In this appeal he contends that the killing was done in self-defense and he relies upon two bills of exception, reserved to the rulings of the trial court, excluding evidence of previous threats and hostile conduct on the part of the deceased, Jeff Gilliland.
It is recited in the first bill of exceptions that, while the defendant was testifying in his own behalf, his attorney asked him why he had shot Mr. Gilliland, and the district attorney objected to the introduction of any evidence of previous threats on the part of the deceased, or of prior difficulties between him and the defendant, not connected with or forming part of the fatal difficulty, on the ground that there was no proof that the deceased had committed an overt act or made a hostile demonstration towards the accused at the time of the killing. The judge ordered the jury to retire from the courtroom, and, in their absence, the defendant’s attorney informed the judge and the district attorney that the evidence intended to be elicited would prove the following facts: That the defendant had shot Mr. Gilliland because, when the former approached the latter and asked him what he was doing there (on the defendant’s premises, after sunset) Mr. Gilliland made a hostile demonstration by thrusting his hand into his coat towards his inside pocket, advancing towards the defendant and saying, “Wait until I get my gun and I will show you;” that the defendant then believed that his life was in danger, because, more than a year before the fatal difficulty, Mr. Gilliland had assaulted the defendant with a shotgun, and was indicted, tried, and convicted of the crime, and in that trial Mr. Gilliland testified that he had intended to kill the defendant, Bryan, and would have killed him if the latter’s wife had not stepped between them; that 10 days before the homicide Mr. Gilliland had attacked the defendant, Bryan, from behind with a scant-ling; and from the time of the first assault until the day of the homicide Mr. Gilliland had made innumerable threats to kill the defendant, Bryan; that 20 witnesses were summoned and present to prove that these threats had been made and were communicated to the defendant before the killing; that on the night before the killing Mr. Gilliland was seen prowling around the defendant’s residence by one Ernest McQueen and by the defendant’s son;' and that, in view of the foregoing facts and circumstances, the defendant believed and feared that Mr. Gilliland was about to carry out his threats when the defendant saw Mr. Gilliland on the former’s premises after sunset on the evening of the homicide.
The evidence of the facts above recited was then formally offered by the defendant’s counsel to show who was the aggressor in the fatal difficulty and to support the plea of self-defense. The district attorney renewed his objection that there was no proof that Mr. Gilliland had made a hostile demonstration on the occasion of the homicide, and the objection was sustained. The evidence on the question of the overt, act or hostile demonstration on the part of Mr. Gilliland was reduced to writing, and is annexed to the bill of exceptions, in compliance with Act No. 113 of 1896.
It is recited in the second bill of exceptions that, on the cross-examination of the defendant as a witness, he testified that he was in his cow pen when he first saw Mr. Gilliland on his (defendant’s) premises, standing near the lot where the defendant had to go to finish feeding his stock, on the evening of the homicide; and that he (defendant) went through his dwelling house on his way from the cow pen to the horse lot; that the prosecuting attorney then asked the defendant why he went to his dwelling, and he replied:
*341 “I bad to go through there; Mr. Gilliland was still standing there, and I was afraid to go down there. I went to the house and waited a ■minute or two in there.”
The prosecuting attorney then asked the ■defendant if he had gone to the dwelling to stay, and he replied:
“No, sir; I had to go back to the lot, and I walked back to the house rather than to the lot, thinking that Mr. Gilliland would walk off-walk on off — the west side of my horse lot, where I had to go to feed. I was afraid to go down there while he ]vas there.”
At the conclusion of this cross-examination, the defendant’s counsel asked him, on redirect examination:
“Mr. Bryan, in answer to a question propounded to you by the prosecution, as to why .you didn’t go into the lot and- finish your feeding, as you had intended, you stated that you ■were afraid. I will ask you to state to the jury what you were afraid of.”
The district attorney urged the objection that the defendant’s counsel was attempting to elicit testimony which had been ruled out by the court because there was no proof that Mr. Gilliland had made any hostile demonstration at the time, or immediately before, he was shot, and the judge again sustained the objection. The defendant’s counsel admits that his purpose in asking the defendant why he was afraid to go to his horse lot where Mr. Gilliland was standing was to bring out the evidence of the previous threats and hostile conduct on the part of Mr. Gilliland, as recited in the first bill of exceptions. It is also stated in the second bill of exceptions that the testimony taken on the subject of the hostile demonstration and annexed to the first bill is also made part of the ■second.
Under the provisions of Act No. 113 of 1896, the evidence annexed to these bills of exception must be accepted by this court “as a correct statement on which the exceptions are based.” ' It consists of the testimony of only three witnesses, the defendant, his 11 year •old son, Ben Bryan, who witnessed the killing, and the physician who examined the dead body of Mr. Gilliland in the position in which he died.
The testimony of the defendant is substantially as follows: 'On the Sunday evening of the killihg, he was in his cow pen and had just finished feeding his cows, after sunset, but before it was quite dark, when his attention was attracted by the voice of Mr. Gilliland talking to the defendant’s son, Ben, who was in an adjoining lot, feeding the horses. The defendant could not hear or understand the conversation, but heard Mr. Gilliland ask the boy something about his papa. The defendant then went to his residence, got his shotgun, loaded with buckshot, and walked out a distance of 30 or 40 yards to a point outside of his lot about 30 or 40 yards from Mr. Gilliland, and asked the latter “in a kind way,” what he was doing there. Mr. Gilliland unbuttoned his coat, thrust his left hand in towards his inside pocket and, advancing towards the defendant, said, “Wait till I get my gun and I’ll show you.” The defendant raised his gun to fire, and Mr. Gilliland turned and received the load of buckshot in his back, not directly from behind him, but at an angle. He moved a step or two, and the defendant fired the second shot, striking his victim in the side. Mr. Gilliland fell to the ground, and the defendant then fired a third load of shot through the head of the wounded man. The defendant testified that he fired the third time because Mr. Gillland was yet trying to get his gun, “scrambling to get up,” and the defendant did not know how badly he was shot. The defendant admits that he did not see a weapon on Mr. Gilliland, and there is no evidence that he had one.
The testimony of Ben Bryan corroborates that of his father in all of its important particulars, except that the boy testified that the first shot struck Mr. Gilliland in the hands, and that the witness thought that it was the second shot that struck him in the back. He testified that when Mr. GU *343 liland came upon the premises he asked the boy where his father was; that when the latter came out of his house he said he was going to see what Mr. Gilliland was doing down there; that the defendant was walking fast, and the boy’s mother was following close behind her husband, talking to him, but the boy could not hear what she was saying.
The physician’s testimony is to the effect that, when he examined the body of the deceased, the right arm was lying almost parallel with the body, and the left arm was across his chest. One buckshot had grazed the arm, 2 had entered the right hand, about 15 had entered the back — not directly from the rear, but at an angle less than 45 degrees from a direct line from behind; and there was a wound in the head, where the shot had entered in front of the upper part of the right ear, had gone through the head, passing out just behind the left ear and continuing into the ground about 3% inches from the head. From this it appears that, after Mr. Gilliland had fallen to the ground, and, as the defendant says, was “scrambling to get up,” Mr. Bryan approached and shot him through the head at close range.
The defendant and his son both testified that the gun with which the killing was done was a single-barrel shotgun, from which it may be inferred that the defendant reloaded the gun after firing the first shot, and again after firing the second shot.
Opinion.
The majority of the members of this court adhere to the opinion expressed by them recently in the case of the State v. Boudreaux, 137 La. 227, 68 South. 422, that it is the province of the judge of the trial court to decide, from the evidence, whether a sufficient foundation has been established for the introduction of evidence of previous threats on the part of the deceased, by proof that a hostile demonstration or an overt act was committed by the deceased on the occasion of the homicide. The district judge, in this case, decided that the evidence was not sufficient to prove that the deceased was the aggressor or committed such an overt act or hostile demonstration on the occasion of the homicide as to warrant his permitting the defendant to introduce evidence of previous threats or hostile conduct on the part of the deceased. And, considering the evidence attached to the bills of exception, the majority of the members of this court approve and affirm his ruling.
The writer of this opinion, however, adheres to the view expressed in his dissenting opinion in State v. Boudreaux, supra, that the question whether the deceased was the aggressor in the fatal difficulty, or committed an overt act or hostile demonstration towards the defendant on the occasion of the killing is a question of fact on which depends the plea of self-defense, and that it therefore pertains directly to the question of guilt or innocence of the defendant. The Constitution expressly provides that this court has no jurisdiction in criminal cases to decide questions of fact pertaining to the guilt or innocence of the accused person. Act No. 113 of 1896 would, in the opinion of the writer, violate this provision of the Constitution if it attempted to give this court jurisdiction to decide (from the evidence attached to the bills of exception) whether the deceased had or had not committed a hostile demonstration on the occasion of the killing. The writer of this opinion, therefore, adheres to the view that this statute only authorizes this court to determine, from the evidence attached to the bills of exception, whether the question of the hostile demonstration was an issue before the jury in connection with the plea of self-defense.
If the bills of exception, or the testimony annexed thereto, disclosed that self-defense was an issue in this case as presented to the jury, the writer of this opinion would hold *345 that the evidence of previous threats and hostile conduct by the deceased towards the defendant should have been submitted to the jury, along with the other evidence, on the question who provoked the fatal difficulty. As a legal proposition, however, the facts submitted by and on behalf of the defendant disclose that the plea of self-defense was not an issue before the jury. His own testimony is a confession of his guilt of.the crime of which he stands convicted; and it is corroborated by the other two witnesses, whose testimony is submitted as a part of the bills of exception. The prosecution being for the crime of manslaughter, not murder, there was no issue before the jury as to whether the homicide was committed with malice aforethought or only in the heat of passion. According to the facts submitted to us by the appellant, and acknowledged in his testimony before the jury, the only legal effect the proof of prior threats and hostile conduct on the part of the deceased could have had would have been to show what provoked the passion in which this crime of manslaughter was committed, and that could not have had any effect upon the verdict which was rendered.
The verdict and sentence appealed from are affirmed.
PROVO STY, J., dissents, holding that a hostile demonstration was shown.